# IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION AT NASHVILLE

JAMES O. WRIGHT,                    )
                                    )
    Respondent/Appellant,        )    Davidson Circuit No. 92D-2402
                                    )
v.                                  )
                                    )    Appeal No. 01A01-9701-CV-00040
KATHY WRIGHT STOVALL,               )
                                    )
    Petitioner/Appellee.         )
                                    )

**FILED**

**October 3, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

### APPEAL FROM THE CIRCUIT COURT OF DAVIDSON COUNTY
### AT NASHVILLE, TENNESSEE

### THE HONORABLE MURIEL ROBINSON, JUDGE

For the Plaintiff/Appellee:        For the Defendant/Appellant:

Phillip Robinson                Clark Lee Shaw
Nashville, Tennessee          Mary Arline Evans
                            Nashville, Tennessee

**AFFIRMED**

HOLLY KIRBY LILLARD, J.

CONCURS:

DAVID R. FARMER, J.

SAMUEL L. LEWIS, J.

**OPINION**

This is a child custody case. The parties had entered into a Marital Dissolution Agreement in which they had joint custody of the minor child. After the father's remarriage, both the mother and father filed petitions seeking custody. The father now appeals the trial court's order awarding sole custody of the parties' child to the mother. We affirm.

James O. Wright ("Father") and Kathy Wright Stovall ("Mother") were married in 1989. Their only child, Daniel Ryan Wright, was born in August 1991. At the time of Daniel's birth, both parties were working full-time. When Daniel was born, Mother took off six weeks to care for him. Father was employed as a chef at the Opryland Hotel and worked unusually long hours, 5 a.m. to 11 p.m. Mother resumed her full-time job for approximately four weeks. After that she worked part-time in order to spend more time with the parties' child. Mother was clearly the primary care-giver during this period.

In June 1992, Mother told Father that she was considering a divorce. Father immediately quit his position at the hotel and became much more involved in raising the child. One month later, Father filed for a divorce, alleging irreconcilable differences. The parties continued to live together until the Final Decree of Divorce was entered in January 1993. The divorce decree incorporated a Marital Dissolution Agreement (MDA) that provided for joint custody of the child with Father designated as the primary physical custodian. The MDA provided that Father would pay all of the child's medical bills and Mother would pay $250 per month in child support. After the divorce, Father continued to reside in the marital residence and Mother moved less than one mile away.

After the divorce decree was entered in January, 1993, the parties alternated care of Daniel. At that time Daniel spent slightly more time in Mother's care, generally spending four nights a week with Mother and three with Father. However, under a fairly complicated schedule, the amount of time spent with each parent was roughly the same. Father testified as to a few problems between the parties during this time, such as miscommunications regarding Daniel's care, but the record indicates that the problems were minimal.

This arrangement continued until Father's remarriage in July, 1994. Father's new wife, Lucy, worked as a radio personality, which permitted her to be at home during the workday, except for one day per week. Mother testified that, after Father's remarriage, the day-to-day activities regarding Daniel became more difficult to work out, with Father's new wife becoming overly involved in the decision making. The parties began to disagree about issues such as which

pediatrician to use and whether Daniel should be told that Santa Claus was make-believe. Mother complained that Father began excluding her from decision making. She stated that Father explained to her that he and Lucy were forming a new "family unit;" Mother also was disturbed by Father telling Daniel that he now had "two mothers."

In the Spring of 1995, Father received a back injury which impacted his ability to work as a chef. Thereafter, he and Lucy have depended on her income as a radio personality for the family's income.

In approximately April, 1995, Daniel was exposed to chicken pox. Father's new wife Lucy was pregnant, and had never had chicken pox. Exposure to chicken pox would have been a health risk to the unborn child, so the parties agreed that Mother would have exclusive care of Daniel until the risk of Lucy contracting chicken pox had abated. This arrangement lasted for approximately a month. After this, Mother testified that Father insisted on a change in the visitation schedule that decreased her time with Daniel. The new visitation schedule included Daniel attending day care on Thursdays, even though Mother was off work on Thursdays and could care for Daniel. When asked about his insistence that Daniel spend Thursdays in day care instead of Mother's care, Father said only that he wanted Mother to "keep the agreement." Father acknowledged that he sought to gradually increase the time Daniel spend in the care of he and his new wife, Lucy, and decrease the time Daniel spent with Mother. Mother complained that Father had changed the document at Daniel's day care center listing persons the day care should notify if necessary, to list Father's wife Lucy first and Mother last. Father explained that he made this change because Lucy could respond more quickly in case of an emergency. Mother testified that Father told her that it was his right to use Daniel as a "legal hammer." Father denied this remark.

At this point Mother consulted an attorney and filed a petition in which she alleged that the problems which developed after Father's remarriage constituted a change in circumstances and sought primary physical custody. Mother testified that, after she filed the petition, she had separate conversations with Father and his wife Lucy. Mother testified that after these conversations she believed that the parties had, for the most part, worked things out to retain joint custody. Mother said that she told Father she wanted Daniel to reside primarily with her, and that Father told her he would consider it and pray about it. She testified that Father suggested that they simply use his attorney to document the agreed changes. Mother then stated that Father came to her house the

following Sunday morning and picked up Daniel. About fifteen minutes after picking up Daniel, he returned alone to Mother's house and presented Mother with a proposed agreement under which Mother would receive "standard visitation;" every other weekend and one week night. Mother testified that Father told her that she had to "sign that piece of paper before I could see Daniel again." When she refused, she testified that he told her she would have to have her attorney set up a hearing date in order to see Daniel. She stated that she was not permitted to see Daniel for twelve days, until the trial court ordered that she be permitted visitation every weekend. Mother stated that, after the trial court ordered visitation, Father refused to permit Mother to speak with Daniel by telephone while Daniel was in Father's care. Thereafter, Father filed a counter-petition, asserting that joint custody was no longer feasible and seeking sole custody.

At trial, the parties testified regarding their respective employment and ability to care for Daniel. At the time of trial, Father was working reduced hours due to his back injury, and he and Lucy were dependent on Lucy's income as a radio personality for their family finances. Husband testified that he anticipated once again being able to work full-time. He admitted having held eleven different chef positions at restaurants throughout Nashville over the past four years. Father emphasized that Lucy was at home during the workday and could care for Daniel instead of sending him to day care. Father admitted that he was currently dependent on Lucy's income and that he and Lucy had undergone marital counseling, although both he and Lucy said their marriage was healthy.

Mother has also remarried, but her remarriage apparently had little impact on the relationship between the parties regarding Daniel. Mother's new husband, Danny Stovall, works full-time, including eight hours on Saturdays. Mother indicated that she is currently working two jobs, arriving home on Monday, Tuesday and Wednesday nights at approximately 8 p.m. At the time of the trial, Mother was pregnant with her first child with Mr. Stovall.

At trial, Mother proffered the testimony of a child psychologist, who opined that the visitation schedule in place at that time was damaging to Daniel, and that Daniel needed more time with Mother. The psychologist expressed the opinion that Daniel related to Mother as primary care giver. The psychologist did not, however, interview Father or observe Daniel in his presence.

At the conclusion of the trial, the trial court awarded sole custody of Daniel to Mother. The trial court set forth its findings and explained its reasoning as follows:

> That the remarriage of [Father] and intervention of the step-mother and

3

changing of schedules initiated by [Father] have caused the joint custody arrangement previously approved by the Court to become unworkable.

That until the arrangement became unworkable, both parties shared custody of the child, but [Mother] had more time with the child which pattern was acquiesced in by [Father].

That the court takes into consideration the tender years doctrine but concludes it to be only one consideration which the Court is to consider pursuant to statute.

That there is no evidence that either of the parties continues to have any lifestyle that would not be conducive and in the best interest of the welfare of the child.

That there is no evidence presented to the Court that either of the parties now uses illegal drugs even though there is evidence that both did so in the past.

That the proof shows that the parties now have different lifestyles at the time of this hearing than the ones they had at the time of the divorce.

That, taking into consideration the testimony of all of the witnesses, their demeanor, their attitudes, their controlling natures and expert testimony presented, the Court finds that both of these parties are fit and proper parents.

That at this time, the Court finds that it is in the best interest of the child and evidence so indicates that sole and absolute custody of the minor child shall be awarded to the Mother, . . . .

The trial court then set forth a visitation schedule in which Daniel resides primarily with Mother during the school year, and primarily with Father during the summer months. The trial court also included the following in its Order:

That the Respondent, James Otis Wright, Jr., and his current spouse, Lucy Wright, shall be ENJOINED AND RESTRAINED from attempting to alienate the affections of the minor child from the Petitioner [Mother].

Father now appeals the trial court's award of sole custody to Mother.

On appeal, Father first asserts that the trial court erred in finding that there was a material change in circumstances warranting a change in custody. Father also asserts that, even if there were a material change in circumstances, the preponderance of the evidence did not support the trial court's decision to award sole custody to Mother.

In child custody cases, appellate review is *de novo* upon the record, with a presumption of the correctness of the trial court's factual findings. Tenn. R. App. P. 13(d); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); *Dalton v. Dalton*, 858 S.W.2d 324, 327 (Tenn. App. 1993).

Father asserts first that the trial court erred in determining that there was a material change in circumstances justifying a change in custody. In essence, Father asserts that the parties should return to a joint custody arrangement. However, in his counter-petition before the trial court, Father asserted that joint custody "is no longer workable or feasible, nor is it in the best interest of the minor child of the parties." At trial, Father testified that the joint custody arrangement in place since the divorce decree had not worked. Mother testified that the joint custody arrangement had not worked

since Father's remarriage.

At trial, Mother testified about a number of incidents which she alleged indicated that joint custody had not worked since Father's remarriage. These included Lucy's over-involvement in the parties' decisions regarding Daniel, Father's unilateral changes to the visitation schedule to reduce Mother's time with Daniel, and Father's insistence that Daniel spend time in day care on days Mother was available to care for him. Mother also complained of instances which she alleged indicated that Father sought to have Lucy replace her as Daniel's mother, such as placing Lucy first on the day care's list of persons to notify, and telling Daniel that he had "two mothers." Mother further cited Father's refusal to allow her to see Daniel without a court order and, after the trial court ordered visitation, his refusal to permit her to speak with Daniel by telephone.

Where the parties have agreed upon joint custody and the arrangement later becomes unworkable, this is a sufficient change of circumstances to warrant a re-evaluation of the custody arrangement. *See Dalton v. Dalton*, 858 S.W.2d 324, 326 (Tenn. App. 1993); *Dodd v. Dodd*, 737 S.W.2d 286, 290 (Tenn. App. 1987). The practical problems of joint custody have been repeatedly acknowledged by this court, especially if there is hostility between the two parents. *See Winchester v. Winchester*, No. 02A01-9604-CH-00092, 1997 WL 61508 (Tenn. App. Feb. 14, 1997); *Jones v. Jones*, No. 01-A-01-9601-CV00038, 1996 WL 512030, at *4 (Tenn. App. Sept. 11, 1996).

Father notes that the Marital Dissolution Agreement entered into by the parties states that the minor child will reside primarily with him. However, the proof established that, until Father insisted on a new visitation schedule that decreased Mother's time with Daniel, the child spent virtually equal amounts of time with each parent, spending slightly more time with Mother.

This Court has repeatedly emphasized the importance of stability for children involved in divorce. *See Williams v. Williams*, No. 01A01-9610-CV-00468, 1997 WL 272458, at * 7, Tenn. App. May 23, 1997); *Contreras v. Ward*, 831 S.W.2d 288, 290 (Tenn. App. 1991) (quoting *Sartoph v. Sartoph*, 31 Md. App. 58, 354 A.2d 467, 473 (Md. 1976)) ("In short, when all goes well with children, stability, not change, is in their best interests."). However, the testimony indicates that Daniel's current situation is unstable, with significant conflict between his parents. To succeed, joint custody "require[s] a harmonious and cooperative relationship between both parents." *Dodd v. Dodd*, 737 S.W.2d at 290. Both parties testified that joint custody had become unworkable, although each saw the other as the problem. The psychologist hired by Mother testified that Daniel's behavior

5

worsened as the conflicts between his parents increased. The record contained sufficient evidence to support the trial court's decision to re-evaluate the custody arrangement.

After it is determined that a material change in circumstances has occurred, sufficient to warrant a re-evaluation of the custody arrangements, the trial court must perform a comparative fitness analysis to make a custody determination. *See Williams*, at * 7. The trial court's findings in making a comparative fitness analysis were cursory in this case:

> That, taking into consideration the testimony of all of the witnesses, their demeanor, their attitudes, their controlling natures and expert testimony presented, the Court finds that both of these parties are fit and proper parents.

> That at this time, the Court finds that it is in the best interest of the child and evidence so indicates that sole and absolute custody of the minor child shall be awarded to the Mother. . . .

The trial court also included in its order the following injunctive relief:

> That the Respondent, James Otis Wright, Jr., and his current spouse, Lucy Wright, shall be ENJOINED AND RESTRAINED from attempting to alienate the affection of the minor child from the Petitioner [Mother].

Many factors are taken into account in making the comparative fitness analysis. *See* Tenn. Code Ann. § 36-6-106. In this case, Daniel clearly loves both parents. Both parents have provided him with necessities. During Daniel's infancy, Mother was clearly the primary care giver. However, since the divorce, the time spent with each parent has been roughly equal, with Daniel spending slightly more time with Mother. Mother proffered the testimony of the psychologist, who testified that Daniel related to Mother as the primary care giver and was distressed at the prospect of leaving Mother to go to Father's house. However, the psychologist had not interviewed Father or seen how Daniel and Father relate to each other.

Both parents have remarried. Mother and her new husband were expecting a child at the time of trial. Father and Lucy had a 6-month old son. Father and Lucy have obtained some marital counseling, but both testified that their marriage is healthy. Father and Lucy are currently dependent on Lucy's income, due to Father's back injury, but there is no indication that they are unable to provide for Daniel. Lucy's work enables her to be at home much of the time, where she could care for Daniel. Father's job history is somewhat unstable, with numerous job changes. At the time of trial, Father was working only part-time, because of his injury, but anticipated going back to work full-time. There was no proof as to his work schedule when he returns to full-time work.

Mother's job history is stable, with continued employment at Tennessee Christian Medical

6

Center. However, at the time of trial, Mother was working two jobs, arriving home at 8 p.m. on Monday, Tuesday and Wednesday nights. Her husband also worked long hours. The record did not indicate whether this would continue after the Stovalls' baby was born.

Looking at these factors alone, the question regarding custody is quite close. However, it should be noted that the trial court, in addition to awarding custody, enjoined Father and Lucy from "attempting to alienate the affections of the minor child" from Mother. In *Varley v. Varley*, 934 S.W.2d 659 (Tenn. App. 1996), this Court affirmed an award of custody to the father, primarily because of the mother's "blatant attempt to alienate the affections of the children from their father." *Varley*, 934 S.W.2d at 667. The father testified that the children had been told that "Dad's bad" and had hit and yelled at the father, with tacit encouragement from the mother and her family. In addition, the mother had encouraged the children's relationship with her paramour, Mr. Ligon, while discouraging their relationship with their father. The Court stated:

> The record also suggests that the children have been encouraged to develop a positive relationship with Mr. Ligon, which is not to be impugned except to the extent that such is detrimental to the children's relationship with their own father.

*Id*. at 667. The Court then observed:

> We believe it [is] in the best interest of these children that they maintain a loving and nurturing relationship with both parents. In light of the record, we do not believe that such can be accomplished by an award of custody to Wife at this time.

*Id*. at 668. Therefore, where one parent has attempted to alienate the affections of the child from the other parent, and has attempted to substitute a third person for the other parent, this mitigates in favor of an award of custody to the other parent, in order to preserve the child's relationship with both parents.

In this case, the record supports the trial court's implicit finding that Father had engaged in attempts to alienate Daniel's affections from Mother, and to have Lucy in effect supplant Mother instead of being simply a loving stepparent. The record is undisputed that Father insisted that Daniel stay in day care on Thursdays, when Mother was off work and could care for him. For a time, Father refused to permit Mother to see Daniel, until court-ordered visitation was imposed. Father refused to permit Mother to speak with Daniel by telephone, and attempted to explain this by stating that the calls were distressing to Daniel. After his remarriage, Father told Daniel that he had "two mothers" and asked Daniel's day care to contact Lucy before contacting Mother, purportedly because Lucy could get there more quickly. As stated in *Varley*, it is in Daniel's best interest to "maintain a loving

7

and nurturing relationship with both parents," and we agree with the trial court's implicit finding that this is best accomplished by awarding custody of Daniel to Mother. The award of sole custody to Mother is therefore affirmed.

Mother seeks attorney's fees on appeal. We do not find an award of attorney's fees appropriate in this case, and so decline Mother's request.

The decision of the trial court is affirmed. Costs are taxed to the Appellant, for which execution may issue if necessary.


                               **HOLLY KIRBY LILLARD, J.**

**CONCUR:**

**DAVID R. FARMER, J.**

**SAMUEL L. LEWIS, J.**

8